IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Maxine Livingston, | ) | C/A No.: 3:13-2695-JMC-SVH |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | REPORT AND RECOMMENDATION |
| Jack Wix, Mr. Norton, Traci Batchelder and Richland County School District Two, | ) ) ) | |
| Defendants. | ) ) ) | |

In this employment discrimination case, Maxine Livingston ("Plaintiff") is suing her former employer, Richland County School District Two ("District"), and District employees Jack Wix, Mr. Norton, and Traci Batchelder (collectively "Defendants"). Plaintiff worked as a bus driver for the District until she resigned in 2013. She is African-American and alleges race discrimination claims pursuant to 42 U.S.C. § 1981 and § 1983, retaliation pursuant to § 1981, and violation of her free speech rights under § 1983.

This matter comes before the court on Defendants' motion for summary judgment filed on July 29, 2014. [ECF No. 12]. After two extensions, Plaintiff filed a response to the motion on August 31, 2014 [ECF No. 17], to which Defendants filed a reply on September 11, 2014 [ECF No. 19]. The motion having been fully briefed, it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.).

Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court grant Defendants' motion for summary judgment.

I.      Factual and Procedural Background

Plaintiff was initially hired as a substitute bus monitor in 2007. [Pl. 39:1–4].[1] In 2008, Plaintiff began working as a bus driver at the District's Support Service (Special Needs) Hub (the "Hub"). *Id.* at 39:8–9. Plaintiff was contractually guaranteed 30 hours of work per week during the school year. *Id.* at 62:5–18. District Transportation Supervisor Brian Mahelsky represents that most drivers are issued bus routes with six hours of drive time per day, with hours exceeding 30 considered extra hours of service. [Mahelsky Aff. ¶ 22, available at ECF No. 12-4 at 1–9; Pl. 62:19–21]. Extra hours can consist of mid-day bus route assignments and field trips. [Mahelsky Aff. ¶ 22]. Extra hours assignments are voluntary and based upon a driver's request, availability, reliability, and current work hours. *Id.* The District modifies schedules and assigns extra hours, in part, to avoid overtime status—a routine practice communicated to all drivers. [*Id.* at ¶¶ 22–23; ECF No. 12-4 at 74 (District policy provides that "ensuring an employee does not exceed a

---

[1] Defendants provide excerpts of Plaintiff's deposition at ECF Nos. 12-2 and 19-5 and cite to the deposition by page numbers. Where feasible, this report cites to Plaintiff's deposition in compliance with *The Bluebook: A Uniform System of Citation,* B7.1.2 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) ("Give as precise a reference as practicable to the cited document, such as the line and page on which the material appears in the cited deposition . . . ."). *See also* Local Civ. Rule 7.05 (requiring appropriate citations with reference to record).

forty hour work week is a priority"); Pl. 64:8–65:7; Wilson Aff. ¶ 5, available at ECF No. 12-5].

During the time that Plaintiff worked for the District, its transportation department had approximately 97 bus drivers and monitors operating 75 regular route buses and 34 special needs buses on 665 bus routes for more than 18,233 students each school day. [Mahelsky Aff. ¶¶ 5, 6]. Approximately 64% of the bus drivers and monitors were African-American. *Id.* at ¶ 6. On each school day, the District's buses traveled more than 12,616 miles, not including extra-curricular activities and athletic teams. *Id.*

In October 2011, Plaintiff failed to confirm via radio that she was returning to a bus stop to pick up a student as directed ("October 2011 incident"). [Pl. 281:1–9; Batchelder Aff. ¶ 5, available at ECF No. 12-10 at 1–3, 9]. Defendants represent that the Hub spent over 45 minutes attempting to contact Plaintiff. [Batchelder Aff. ¶ 5; ECF No. 12-10 at 9]. After receiving no reply, District Transportation Supervisor Jack Wix personally visited the student's home to confirm that Plaintiff had picked up the student. *Id.* While Wix was en route to the student's home, another bus driver [named Jessica] reported over the radio that Plaintiff's bus was stopped at a particular intersection. *Id.* Plaintiff responded to Jessica's report by stating over the radio that Jessica should "mind her own business." [*Id.*; Pl. 289:8–16].

Plaintiff concedes that she ignored the Hub's calls to her over the radio and on her cell phone. The District's management reviewed the bus videotape of the incident and state that Plaintiff was observed to be speaking with someone on her cell phone while driving the bus (in violation of the District's procedures and federal law), that Plaintiff

3

said she was not going to answer the repeated calls from the Hub, and that she did in fact ignore the calls from the Hub. [Batchelder Aff. ¶ 5; ECF No. 12-10 at 18–22]. The District verbally counseled Plaintiff following the October 2011 incident. *Id.*

During the 2011–12 school year, 17 of the District's 35 special needs school buses were built in the 1980s and averaged over 400,000 miles each. [Mahelsky Aff. ¶ 7]. As of October 2011, the District had 21 of its 108 route buses out of service. *Id.* The District states that broken-down buses are replaced by available spare buses, and if there are no spare buses available, the Hub determines routes to combine or split. [*Id.*; Goodwin Aff. ¶¶ 2, 4–5, available at ECF No. 12-8].

The District states that during October 2011, Plaintiff's Bus 230 was approximately the sixth or seventh bus to go out of commission. [Mahelsky Aff. ¶ 8; Goodwin Aff. ¶ 5]. Because there were no spare buses available to replace Plaintiff's bus on October 28, 2011, the District required her to double up her route with another bus driver. [*Id.*; Pl. 150:1–23].

Around October or November 2011, Plaintiff asked Wix why her bus was taken and when she would be getting her own bus back. [Pl. 142:3–143:11]. Plaintiff complained that the District was taking buses from black drivers and given them to white drivers, thereby requiring the black drivers to double up their routes. [*Id.*; Mahelsky Aff. ¶ 33]. The rationale for the bus and route assignments was explained to Plaintiff, which included that the assignments had nothing to do with race. [Mahelsky Aff. ¶ 34; Pl. 150:14–23]. The discussion involved Plaintiff and Wix raising their voices. [Pl. 154:2–15]. The following day, Plaintiff reported the verbal altercation to Traci Batchelder,

Director of Classified Personnel and Employee Services. [Pl. 162:1–9; Batchelder Aff. ¶ 3]. On November 4, 2011, Batchelder investigated the verbal altercation and the October 2011 incident. [Pl. 162:1–23; Batchelder Aff. ¶¶ 3–5]. Batchelder found no evidence to support that bus allocations or route assignments were being made on the basis of a driver's race. [Batchelder Aff. ¶¶ 4–5].

On December 7, 2011, Plaintiff met with Batchelder again to discuss her concerns regarding the fairness of bus assignments and mid-day assignment routes, and the alleged unprofessional conduct of and favoritism shown toward African-American dispatcher Cecondia Goodwin. [*Id.*; ECF No. 12-10 at 8–9].

On December 12, 2011, Batchelder met with Transportation Manager Wayne Norton, Mahelsky, and Wix to discuss Plaintiff's concerns. [Batchelder Aff. ¶ 5; ECF No. 12-10 at 9–10]. Also on December 12, 2011, Plaintiff's assigned bus monitor, African American Sabrina Glover, requested to be removed from Plaintiff's bus because she felt Plaintiff was "very rude" and did not "know how to talk to people." [Mahelsky Aff. ¶ 28; Batchelder Aff. ¶ 5; ECF No. 12-10 at 10]. Another monitor was assigned to Plaintiff's bus route. *Id.*

On December 13, 2011, Plaintiff's new bus monitor, African American Pamela Simmons, was a few minutes late. [Mahelsky Aff. ¶ 29; ECF No. 12-10 at 10]. Plaintiff contacted Hub dispatcher Tammy Rivera to inquire about Simmons's whereabouts. [Mahelsky Aff. ¶ 29]. When Rivera reported that the Hub was attempting to find out what happened to Simmons, Plaintiff reportedly made rude comments and hung up the phone. *Id.* Plaintiff thereafter abandoned her route and went to the Hub to confront Mahelsky

regarding the situation. *Id.* at ¶ 30. Plaintiff's abandonment of her route resulted in the District's having to find last minute coverage for the route and to make changes involving three other employees' assignments, causing the bus to be late. *Id.* Plaintiff claims that she just got mad because she thought management was doing things deliberately and that she wanted to leave because her blood pressure had risen. [Pl. 185:14–186:16]. That day, December 13, 2011, Batchelder, Norton, and Mahelsky met with Plaintiff. [Batchelder Aff. ¶ 4]. Batchelder sent Plaintiff a follow-up letter dated January 12, 2012, including her findings regarding the investigation, summarizing the District's concerns, and outlining the District's expectations for her performance. [*Id.*, ECF No. 12-10 at 5–6]. Batchelder found no evidence that Plaintiff had been treated unfairly or inappropriately or that bus drivers were treated differently based on race. [Batchelder Aff. ¶¶ 4, 5, 6; ECF No. 12-10 at 7–16]. Batchelder concluded that Plaintiff interpreted routine or explainable issues as retaliatory. [Batchelder Aff. ¶ 4; ECF No. 12-10 at 6].

On December 29, 2011, Plaintiff filed an administrative charge with the South Carolina Human Affairs Commission ("SCHAC"), alleging race discrimination and retaliation. SCHAC issued a "no cause" determination on August 13, 2012, which findings the Equal Employment Opportunity Commission ("EEOC") adopted on October 3, 2012, and issued, together with a right to sue letter.

Around February 2013, Plaintiff resigned her employment with the District, after having found another job earlier that year that paid more. [Pl. 70:1–71:20]. Plaintiff filed this action on October 2, 2013. [ECF No. 1].

II.     Discussion

A.      Summary Judgment Standard

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.    Analysis

Plaintiff generally argues that Defendants discriminated against her based upon her race in violation of 42 U.S.C. § 1981 and § 1983. Claims pursuant to § 1981 and § 1983 are subject to the same analysis as Title VII claims. *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649, n. 1 (4th Cir. 2002) (analysis of § 1981 claim the same as Title VII); *Gairola v. Commonwealth of Va. Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same."). Title VII makes it unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions or privileges of employment on the basis of race.  42 U.S.C. § 2000e–2(a). Plaintiff's § 1981 claim cannot survive summary judgment independently of § 1983, as § 1983 is the exclusive remedy for violations of § 1981 by state actors. *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995) (citing *Jett*, 491 U.S. 701 (1989)).

1.    § 1981 and § 1983 Discrimination Claims

Plaintiff alleges that Defendants unlawfully discriminated against her based upon her race by subjecting her to disparate employment terms and conditions compared to her white counterparts. [ECF No. 1 at ¶¶ 12–13, 21–22]. Plaintiff's complaint is not the model of clarity.  However, it appears that Plaintiff alleges (1) she was constructively terminated by not being assigned field trips; (2) in October 2011, she complained to Wix that Defendants were reassigning buses from black drivers to white drivers, leaving blacks to double up on routes, and Plaintiff was assigned a bus that could not accommodate her wheelchair-bound student; (3) she was assigned a bus that was a

hazard; (4) the District did not send assistance when she was involved in an accident and did not adequately respond to her bus breakdown; (5) black drivers were held to a higher standard than whites regarding discipline; (6) whites were promoted to positions not posted such that black employees could also apply; and (7) she was issued a letter of reprimand in November 2011. *Id.* at ¶¶ 5–7. In her response to Defendants' motion, Plaintiff makes additional claims that she did not assert in her complaint, including that (8) Defendants relied on information from another driver over the radio such that Plaintiff felt threatened and could not defend herself; (9) the District did not pay for her vacation time following her resignation and required her to sign over her workers' compensation check to the District; and (10) Plaintiff alleges that black drivers were allegedly made to go through the back door employee entrance after President Obama was elected in 2008 and were otherwise restricted from wearing political paraphernalia. [ECF No. 17 at 4, 5, 7, 8, 10, 11, 12].

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under the *McDonnell-Douglas* framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination. To establish a prima facie case of racial discrimination, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). The fourth element can also be established by presenting evidence raising an inference of discrimination. *See Miles v.*

*Dell, Inc.*, 429 F.3d 480, 486–87 (4th Cir. 2005); *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n.2 (4th Cir. 2001) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).

If Plaintiff establishes a prima facie case, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for the disparate treatment. *Burdine*, 450 U.S. at 254. This is merely a burden of production, not of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

Once Defendants have met their burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not the true reason, but pretext for discrimination. *Reeves*, 530 U.S. at 143. Throughout the burden-shifting scheme set forth in *McDonnell Douglas*, the ultimate burden of proving that Defendants intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendants intentionally discriminated against her.

<u>No Adverse Employment Action</u>

Defendants argue that Plaintiff has failed to establish a prima facie case of discrimination because she has not demonstrated that she suffered an adverse employment action. "An adverse employment action is a discriminatory act which

adversely affects the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375–76 (4th Cir. 2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

(1)    No Constructive Termination

Plaintiff alleges that she was constructively terminated by not being assigned field trips. [ECF No. 1 at ¶ 7]. Defendants argue that because Plaintiff voluntarily quit her job as a school bus driver to pursue another job opportunity for more pay, she did not suffer an adverse employment action. *See Shealy v. Winston*, 929 F.2d 1009, 1012–13 (4th Cir. 1991); *see also Evans v. Davie Truckers, Inc.*, 769 F.2d 1012, 1014 (4th Cir. 1985) (upholding a ruling that because the "evidence clearly established that [the employee] voluntarily resigned his employment with the defendant, [he] suffered no adverse employment action at the hand of the defendant" (internal quotation marks omitted)).

In support of their argument that Plaintiff did not suffer an adverse employment action, Defendants cite to Plaintiff's deposition testimony, in which she admits to having voluntarily resigned her position:

Q:    You stopped working for the district you said sometime in—from your recollection, either February 2013?
A:    Yes, ma'am.
Q:    Is that right? Okay. And were you fired?
A:    No, ma'am. I quit.
Q:    You voluntarily
A:    Yes, ma'am.
Q:    —resigned from employment. Okay.

Pl. 66:11–20.  Plaintiff concedes she began her new job prior to resigning as a school bus driver:

Q:    Okay. So you had already been hired by the detention center before you resigned from Richland School District, is that right?
A:    Correct.
Q:    Okay. Okay. So once you knew that you had another job somewhere
A:    Then I let them know.
Q:    —you resigned?
A:    Yes.

Pl. 70:14–22.  Further, Plaintiff admits that the job she obtained was better-paying than her job as a school bus driver:

Q:    Okay. What's the difference in pay in terms of what you are receiving through the detention center versus what you received with Richland School District Two?
A:    The difference?
Q:    Uh-huh. Or is there a difference?
A:    Yeah, it's about $300 difference.
Q:    More or less?
A:    More.
Q:    I'm sorry, let me clarify. Do you make $300 more with the detention center than you did driving for Richland Two?
A:    Yeah.
Q:    Okay. So you're making more money now than you did—
A:    Correct.
Q:    —okay.

Pl. 70:23–71:14.

Although in her complaint Plaintiff alleges she was "constructively terminated" [ECF No. 1 at ¶¶ 5, 7], by her own admission, she quit for a better-paying job, and therefore, did not suffer an adverse employment action.

To the extent that Plaintiff alleges that she quit because she was not assigned field trips, her argument is unavailing.  Defendants argue that the evidence does not support that Plaintiff's mid-day assignments were reduced or that she was not given field trips for

having complained. Plaintiff was only contractually guaranteed 30 hours of work assignments per week, with field trips not guaranteed. [Mahelsky Aff. ¶ 22; ECF No. 12-4 at 74; Pl. 62:5–18]. During the relevant period, Plaintiff's standard bus route consisted of approximately seven hours of drive time per day. [Mahelsky Aff. ¶ 26; ECF No. 12-4 at 76–78 (timesheets)]. Defendants argue that if Plaintiff continued with more than two mid-day assignments, while maintaining a standard seven-hour bus route, it would have put her over the 40-hour maximum. [Mahelsky Aff. ¶ 26]. Defendants note that during the period of November 2011 through March 2012, at least 30 other drivers had their hours or mid-day assignments reduced due to overtime accumulation. [*Id.*, Williams Aff. ¶ 5, available at ECF No. 12-9; Hurst Aff. ¶ 7, available at ECF No. 12-7; ECF No. 12-10 at 13]. Defendants argue it is illogical to conclude that Plaintiff's reduction in mid-day assignments or lack of additional field trip assignments were in any way related to her complaint.

     In her response, Plaintiff does not provide any evidence in support of her claim that her hours were cut below her contractually-guaranteed 30 hours per week.[2] Because

---

[2] Plaintiff's brief does not cite to any evidence in the record. It contains no exhibits, aside from a document titled "Affidavit of Maxine Livingston" dated August 30, 2014, which appears to be a copy-paste of the brief. Fed. R. Civ. P. 56 requires much more of Plaintiff (and Plaintiff's counsel). The affidavit purports to give Plaintiff's version of the facts of the case, and the brief relies on this affidavit rather than on deposition testimony, despite the fact that it appears at least some of the information addressed in the affidavit was also addressed in Plaintiff's deposition. Discovery in this case closed on July 14, 2014. [ECF No. 8]. Prior to the close of discovery, Plaintiff was deposed, at which time she was given the opportunity to state the facts on the record and be subject to examination regarding those facts. Her failure to rely on the record facts in opposing summary judgment violates Fed. R. Civ. P. 56(c)(1)(A), which provides that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." *See also* Fed. R. Civ. P. 56(e) (stating that a

Plaintiff has not shown an adverse employment action concerning a reduction in her hours, her claim fails.

(2)     October 2011 Complaint about Bus Assignments

Plaintiff claims that two students were removed from her Bus 230 and reassigned to a white driver. [Pl. 191:1–192:24]. Defendants note that in October 2011, several buses were out of commission, which required some drivers to combine routes, including Plaintiff. [Mahelsky Aff. ¶ 8]. Defendants state that wheelchair-bound students were removed from Plaintiff's route and split among other bus routes based on bus capacity and the schools served. *Id.* at ¶ 9. Defendants state that when Bus 230 returned from having repairs made, the wheelchair-bound students had already been rerouted to other routes and their parents requested to keep their children on the new routes. *Id.* Defendants state it was thereafter unnecessary to provide a wheelchair-accessible bus for Plaintiff's route. *Id.* Defendants note that during Plaintiff's employment with the District, its Transportation Department served more than 18,233 students transportation each school day, such that it is illogical to claim that the removal of two students from Plaintiff's route was retaliatory or connected to her complaints.

---

party must properly support his assertions of fact and properly address another party's assertions of fact). Consequently, the undersigned disregards Plaintiff's post-discovery-deadline declaration in setting forth the factual background in this case. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Fuller v. Cnty. of Charleston*, 444 F. Supp. 2d 494, 499 (D.S.C. 2006) (citing *Larken v. Perkins*, 22 F. App'x. 114, *1 (4th Cir. 2001) (noting that the district court properly found a party's "own, self-serving affidavit[s] containing conclusory assertions and unsubstantiated speculation" insufficient to stave off summary judgment)).

In her response, Plaintiff does not provide any evidence disputing Defendants' position concerning the bus assignments or the wheelchair-bound students. Independently, the court finds that the bus assignments and removal of two students from Plaintiff's bus route do not constitute adverse employment actions. Therefore, Plaintiff's claim fails.

(3)     Plaintiff's Bus Condition

Plaintiff claims that she was assigned a hazardous bus because of her complaints to Defendants. Defendants note that buses are not assigned to drivers, but are assigned to routes. [Mahelsky Aff. ¶ 14]. Mahelsky states that August 2011–May 2012 was the worst bus repair period the Hub had experienced in six years. [*Id*. at ¶ 10]. Defendants represent that Plaintiff's Bus 230 broke down and was replaced by Bus 224, which had a smoke issue. [*Id*. at ¶ 13]. Bus 224 was replaced by Bus 206, which subsequently broke down. *Id*. Bus 206 was then replaced with Bus 230, which had returned from the repair shop; however, Bus 230 had fumes. *Id*. To stop the fumes, the repair shop turned off the heat on Bus 230. *Id*. Plaintiff then requested to be provided with a bus with heat. *Id*. To accommodate Plaintiff's request to have a bus with heat, the District switched drivers with Bus 206 once it had been repaired. *Id*. As result, Plaintiff was assigned Bus 206 and another driver operated Bus 230. *Id.*

In her response, Plaintiff does not dispute this evidence and has not demonstrated that she was assigned a hazardous bus. Because Plaintiff has failed to identify the allegedly-hazardous bus she was assigned, she has failed to establish an adverse employment action. To the extent that Plaintiff is complaining about Bus 230, she has

not overcome Defendants' evidence that the state certified the bus as safe and not hazardous. [*Id*. at ¶ 14].

(4)     Response to Plaintiff's Bus Accident and Breakdown

Plaintiff alleges that management within the Transportation Department retaliated against her by allegedly not sending assistance when her bus broke down or when she was involved in a bus accident. [Pl. 201:13–25]. In November 2012, Plaintiff's school bus was rear-ended by a student driver as she was turning into Ridgeview High School. [Mahelsky Aff. ¶ 15]. Upon inspection, the bus shop determined that there was minimal damage to the bus. *Id*. Following the incident, Plaintiff's supervisor inquired about her condition and remained with her at the scene. [*Id*; Pl. 205]. Plaintiff was offered medical assistance and declined. [Mahelsky Aff. ¶ 15; Pl. 205–06]. Because the bus was drivable and Plaintiff indicated that she did not need any medical assistance, the District determined a bus replacement was unnecessary and no one was dispatched to the scene to pick up Plaintiff or her monitor. [Mahelsky Aff. ¶ 15]. Defendants submit the incident was handled in accordance with standard operating procedures. [*Id.*; ECF No. 12-4 at 11 (breakdown procedure)].

Defendants state that the State Bus Shop, which is operated by the South Carolina Department of Education, maintains the buses operated in the District. [Mahelsky Aff. ¶ 12]. Under the Transportation Department's standard operating procedures, when buses break down, a report is made to the Hub, which contacts the State Bus Shop. [*Id.*; ECF No. 12-4 at 11]. The State Bus Shop then dispatches a mechanic to the bus's location. *Id*. Plaintiff herself admits the Hub does not have any control over the repair times on buses.

16

[Pl. 213:22–214:10]. Because Plaintiff has not established that the named defendants or any other Hub personnel retaliated against her by failing to respond to mechanical failures of her bus, she has failed to establish an adverse employment action by Defendants concerning her bus breakdown or accident.

(5)     Disciplinary Standards for Drivers

In her complaint, Plaintiff alleged that Defendants held African-American bus drivers to higher standards and disciplined them more harshly than whites. [ECF No. 1, ¶ 6].  However, in her deposition, Plaintiff admitted she has no evidence to support her allegation:

Q:      At any point while you've been employed with Richland Two have you complained about black bus drivers being treated differently than white bus drivers?

A:      No, ma'am.

Q:      So the incident in which you complain about doubling up is the only time you've complained about there being a disparity in treatment between bus drivers

A:      Yes, ma'am.

Q:      —based on race? Okay. Only that. Have you ever complained to Richland Two— and when I say Richland Two, I mean district or HR or, you know, anybody in transportation management, that black bus drivers were disciplined more harshly than white bus drivers?

A:      No. Now that, I wouldn't know.

Q:      Okay. Never complained about that?

A:      I—I'm not

Q:      Okay. I'm saying have you?

A:      Yeah. I way—no. No.

Q:      Have you complained about that?

A:      Have I complained?

Q:      Yeah.

A:      No.

Q:      Okay. And do you think that's the case? Do you think black bus drivers are disciplined more harshly than white bus drivers?

A:      I don't know.

Q:      I'm asking you do you think that? Is there any reason that you would believe that?

A:      I don't know.

Q:      Okay. Well I'm asking you do you think that, and you're saying you don't know.

17

A:      I know what happened to me. I don't know. I mean—

Q:      Do you have any examples that would lead you to believe that black bus drivers
        are disciplined more harshly than white bus drivers?

A:      I can't answer that question. I mean because you—it's a—a lot of things that go
        on, but I don't know.

Pl. 214:23–216:15. Defendants maintain that each year the District's bus drivers receive

handbooks that contain policies and procedures that drivers are expected to follow and

that are enforced regardless of race.  Because Plaintiff has failed to identify a genuine

issue of material fact to support her allegation concerning disparate disciplinary

standards, summary judgment is appropriate on the claim.

(6)      Promotions

Plaintiff claims that Caucasian drivers were promoted to the positions of

Transportation Operations Officer and Activity Bus Supervisor, but that these positons

were not advertised to African-American bus drivers. Defendants state that job openings

within the Transportation Department are advertised to all employees by being posted on

the District's website. [Mahelsky Aff. ¶ 20]. Defendants have provided the postings made

for these two positions. [*Id.*; ECF No. 12-4 at 18–24]. Because Plaintiff has not rebutted

the evidence disproving her allegations concerning the postings of these positions, her

claim fails. To the extent that Plaintiff alleges in her response that African-American bus

drivers had less access to the internet and were unaware of the postings, Defendants have

submitted Mahelsky's supporting affidavit that states that the District provides a

computer with internet access within the Support Service Center break room that all bus

drivers are permitted to use to complete training modules and to review information from

the District's intranet. [Mahelsky Supp. Aff. ¶ 5, available at ECF No. 19-1]. Defendants

further note that 2 African-American employees applied for the Activity Bus Supervisor position and 19 African-Americans applied for the Transportation Operations Officer. [Batchelder Supp. Aff. ¶ 6, available at ECF No. 19-2]. In light of the foregoing undisputed evidence, Plaintiff's allegations concerning the job postings fail to survive summary judgment.

### (7)     November 2011 Letter of Reprimand

Plaintiff claims that she was issued a letter of reprimand for expressing concerns about her working conditions. [ECF No. 1 at ¶ 17]. Although a letter was issued to Plaintiff on January 12, 2011, from Batchelder, this was written in follow up to their earlier conferences, summarizing the District's concerns and outlining the District's expectations for Plaintiff's performance. [Batchelder Aff. ¶ 4; ECF No. 12-10 at 5–6]. To the extent the letter could be construed as a letter of reprimand, courts have held that letters of reprimand and admonishment are not actionable adverse employment actions. *Johnson v. Danzig*, 213 F.3d 631 (4th Cir. 2000). Plaintiff offers no evidence that she was denied a promotion, bonus, compensation, or any other similar employment opportunity as a result of the letter from Batchelder. Therefore, Plaintiff has failed to allege an adverse employment action.

### (8)     Radio Report to Hub

During 2011, Plaintiff reportedly failed to confirm via radio that she was returning to a bus stop to pick up a student as directed. [Batchelder Aff. ¶ 5; ECF No. 12-10 at 9]. Another driver named Jessica reported over the radio that Plaintiff's bus was stopped at a particular intersection. [*Id.*; Pl. 280–81]. Plaintiff claims that management somehow

retaliated against her by relying on Jessica's report. [ECF No. 17 at 10]. The unsupported allegation of retaliatory action does not establish an adverse employment action.

(9)    Vacation Pay and Workers' Compensation Check

Plaintiff claims that she was not paid for unused vacation days and was required to sign over her workers' compensation check to the District in retaliation for complaining about employment practices. [Pl. 206–07]. Defendants state the District's bus drivers are only required to work during the school year and do not accrue vacation time. Thus, Plaintiff would not have been due any pay for unused vacation time when she resigned. [Batchelder Aff. ¶ 8]. For employees serving a minimum of 15 years of consecutive creditable service in the District, accumulated sick leave in excess of 57 days is converted to annual leave and paid out. *Id.* Because Plaintiff did not work a minimum of 15 years with the District, she did not qualify to be paid for her unused annual leave. *Id.*

Defendants state that with regard to the allegation concerning workers' compensation, any financial transactions involving workers' compensation claims filed by employees are handled by the District's Finance Department as opposed to the District's Human Resources Department or District's Transportation Department. [Batchelder Aff. ¶ 7]. Plaintiff has not established that any of the named defendants had any involvement in the processing or handling of any workers' compensation claim she filed. *Id.* Thus, while Defendants dispute the validity of Plaintiff's claims, even if true, she could not establish any causal connection on this claim as against Defendants.

20

(10)    Political Restrictions

Plaintiff alleges that black drivers were allegedly made to go through the back door employee entrance after President Obama was elected in 2008 and were otherwise restricted from wearing political paraphernalia. [ECF No. 17 at 4, 5, 7, 8, 11, 12]. The statute of limitations under 42 U.S.C. § 1981 is four years. *See* 28 U.S.C. § 1658; *Jones v. R.R. Donnelley Sons Co.,* 541 U.S. 369, 383–84 (2004). Plaintiff filed suit on October 2, 2013; therefore, any alleged violation of § 1981 that occurred before October 2, 2009, including Plaintiff's complaint concerning restrictions on political paraphernalia prior to the November 2008 election is time-barred. *See, e.g., Jones,* 541 U.S. at 383–84; *McDougal-Wilson,* 427 F. Supp. 2d at 604 n. 2.

As to Plaintiff's complaint concerning mandatory use of the back door entrance, Defendants note that all Hub employees, including all bus drivers, were asked to refrain from congregating in the lobby/reception area since the noise was disruptive. [Mahelsky Aff. ¶ 32; Norton Aff. ¶ 4, available at ECF No. 19-4; Choate Aff. ¶ 4, available at ECF No. 19-3]. Defendants have provided evidence that the request applied to all bus drivers, regardless of race or political affiliation. *Id.* Plaintiff has failed to produce any evidence that this requirement applied to only African-American bus drivers or that the reason behind the request was pretextual. Furthermore, Plaintiff's allegations concerning political restrictions in 2008 cannot logically be related to alleged retaliatory or discriminatory conduct that subsequently occurred in October 2011.  Therefore, summary judgment is appropriate.

In sum, Plaintiff has failed to establish that she suffered any adverse employment action. A mere change in an employee's job assignment, even if "less appealing to the employee, . . . does not constitute adverse employment action." *Booz–Allen*, 368 F.3d at 376. A "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir. 1999). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* at 256–57; *see also Taylor v. Va. Dep't of Corrs.*, 177 F. Supp. 2d 497, 504–05 (E.D.Va. 2001). Plaintiff fails to point to evidence that any of the alleged discriminatory conduct resulted in a decrease in compensation, job title, level of responsibility, opportunity for promotion, or had any other significant detrimental effect. Consequently, the undersigned concludes Plaintiff has failed to state a prima facie case of discrimination.

Even if Plaintiff were to establish a prima facie discrimination claim, she has failed to demonstrate that the legitimate reasons produced by Defendants for the actions are pretext for discrimination. The undersigned finds the District's rationale for developing bus assignments was reasonable and notes that Plaintiff has presented no evidence suggesting that her race was a factor in the assignment of her schedule.

"[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)

(internal quotation marks omitted).  Plaintiff has failed to show that Defendants' reasons for their employment actions were pretext for intentional discrimination.  Therefore, summary judgment is appropriate on Plaintiff's § 1981 and § 1983 claims.

### 2.    § 1981 Retaliation Claim

Plaintiff also asserts a retaliation claim under § 1981.  Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e−3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action.  *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998).  Once Plaintiff establishes the elements of her prima facie case, the burden shifts to Defendants to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action.  *See Burdine*, 450 U.S. at 253. At that point, Plaintiff has the opportunity to prove that Defendants' legitimate, non-retaliatory reason is pretextual.  *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 271 (4th Cir. 2001).

Based on the foregoing, the undersigned recommends granting Defendants' motion for summary judgment on Plaintiff's retaliation claim, as she has failed to demonstrate any adverse employment action, or any causal connection between her one

complaint to management concerning bus assignments and any alleged adverse employment action.

### 3.     § 1983 Free Speech Claim

Plaintiff alleges that the Defendants' actions somehow constitute a violation of her right to free speech under the First Amendment of the United States Constitution, giving rise to a claim pursuant to 42 U.S.C. § 1983. Specifically, Plaintiff contends that the Defendants violated her right to free speech and to criticize the government by threatening and then punishing her for criticizing the District's alleged discriminatory practices. [ECF No. 1 at ¶ 30]. Plaintiff's § 1983 retaliation claim must establish three elements: (1) Plaintiff's speech is protected; (2) that Defendants' alleged retaliatory conduct adversely affected Plaintiff's constitutionally-protected speech; and (3) a causal relationship exists between the speech and Defendants' retaliatory action. *Blakenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006). Because Plaintiff's complaints all concerned private matters (her mid-day assignments, her bus condition, and the retaliation she perceived by her supervisors), her speech did not involve a matter of public concern, thus defeating her First Amendment retaliation claim.

Even if Plaintiff's speech were to have involved a matter of public concern, she cannot show that her expression was the "but for" cause of any decisions concerning the terms and conditions of her employment. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Dimeglio v. Haines*, 45 F.3d 790, 804 (4th Cir. 1995). There is no evidence that any decisions involving Plaintiff's routes, mid-day assignments, bus or any other conditions concerning her employment had a retaliatory motive traceable to

her complaints. Thus, summary judgment is appropriate on Plaintiff's First Amendment claim.

Because there are no issues of material fact in dispute and Defendants are entitled to judgment as a matter of law on each of Plaintiff's claims, the undersigned recommends granting the motion for summary judgment in its entirety.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendants' motion for summary judgment [ECF No. 12] be granted.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

December 5, 2014                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).